

**THOMAS J. CATLIOTA**
**U.S. BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
at Greenbelt

| | | |
|---|---|---|
| In re: | * | Case No. 16-24661-TJC |
| Essex Construction, LLC | * | Chapter 11 |
| Debtor | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OF DECISION

Bradford Englander, the Chapter 11 Trustee (the "Trustee") for the debtor Essex Construction, LLC., seeks approval of a settlement with M&T Bank ("M&T"), the Laborers Trust Fund of Washington D.C. (the "Fund"), The Whiting Turner Contracting Company ("Whiting Turner"), and the debtor. ECF 386. The settlement resolves disputes among the parties that arose because the debtor obtained a cashier's check from M&T and delivered it to the Fund in contravention of an order of this court. Before the cashier's check was honored, M&T stopped payment and now holds the funds. As pertinent here, under the settlement the funds will be delivered to the Trustee and all parties will receive releases. Firstrust Bank and Industrial Bank (collectively the "Banks") oppose the settlement in one limited sense: A provision in the settlement requires a determination that the transfers that occurred when the cashier's check was issued, or when payment was stopped, or when the check was delivered to the Fund are avoided

1

under 11 U.S.C. §549[1] as unauthorized post-petition transfers. The Banks argue this provision is unwarranted because no transfer occurred. They contend that the provision may prejudice their claim that their lien rights attach to the funds when returned to the debtor under the settlement.

For the reasons stated herein, the court will approve the settlement, including a provision that a transfer is avoided under §549. Whether, and to what extent, this ruling affects the Banks' lien rights will be addressed as applicable in further proceedings.

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. This is a core matter pursuant to 28 U.S.C. §157(b) and venue is proper before this court pursuant to 28 U.S.C. §§1408 and 1409.

## Findings of Fact

*Background and the Unauthorized Cashier's Check.*

On November 4, 2016, the debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. Throughout the case, the Banks claimed a lien on the debtor's accounts receivable and other assets, and the debtor was authorized at various times to spend funds pursuant to a cash collateral order and budget.

On December 5, 2016, the United States Trustee filed a motion to appoint a Chapter 11 trustee, or to convert the case to Chapter 7. ECF 70. A hearing was initially scheduled for January 25, 2017, and by agreement of the parties, it was continued to March 17, 2017.

On March 3, 2017, Firstrust filed an emergency motion to expedite the hearing on the motion to appoint the trustee, arguing that the debtor was dissipating funds in violation of the cash collateral order, among other concerns. ECF 240. The court set the emergency motion for hearing on March 6, 2017. There, the court revoked the debtor's existing authority to make any

---

[1] Unless otherwise noted, all statutory references herein are to the Bankruptcy Code, 11 U.S.C. §§101 *et seq.*, as currently in effect.

disbursements prior to March 17. The debtor was prohibited from spending any funds unless the Banks expressly approved any specific payment request. In the event the Banks did not approve the payment, the court would hold an emergency hearing on the necessity of the payment. The court required the debtor's counsel to inform the debtor's employees who had signatory authority on its bank accounts of the order.

On March 8, 2017, without having obtained approval from the Banks or the court, the debtor obtained a cashier's check from M&T made payable to the Fund in the amount of $545,000. That day, the debtor delivered the check to the Fund. On March 10, 2017, the Fund deposited the cashier's check into its bank account at Capital One Bank. Before the cashier's check was honored, the debtor convinced M&T to stop payment on the check. Since that time, the Fund has retained physical possession of the cashier's check and M&T has retained the funds.

At about the same time, the debtor consented to the appointment of a Chapter 11 trustee. ECF 265. On March 17, 2017, the Office of the United States Trustee appointed the Trustee, ECF 279, and the court confirmed the appointment by order entered on March 21, 2017. ECF 288.

*The Proposed Settlement*.

The debtor had the cashier's check issued to the Fund as a payment toward the Fund's claim for pension benefits. The debtor is a subcontractor of Whiting Turner on a project owned by MGM National Harbor LLC. The Fund asserts a claim of $666,065.25 for employee benefits due on account of services performed by union employees on behalf of the debtor at the project. The Fund has the right to assert a mechanics lien against the project that is the subject of the contract. The fifth cash collateral order entered between the Banks and the debtor authorized the

3

debtor to pay the union benefits only if Whiting Turner first paid the debtor for various invoices in an amount equal to or in excess of such union benefits. ECF 138 at p. 3 ("For the purposes of clarity, the Debtor shall not be permitted to pay [the Fund for the union benefits] unless and until Whiting Turner first remits the funds necessary to pay such benefits . . . ."). Whiting Turner did not pay the invoices out of concern that the debtor would not use the funds to pay the Fund for the union benefit claims. When the cashier's check was issued, Whiting Turner had not paid, and still has not paid, the invoices, nor had the Banks approved the payment to the Fund in accordance with the court's requirement.

Soon after his appointment, the Trustee learned of the issuance of the cashier's check and that payment on it had been stopped. He recognized that he could bring a claim under §549 to recover the funds from M&T, but he decided to take a broader approach by attempting to resolve all of the claims of the Fund and Whiting Turner.

After negotiations, the parties reached an agreement under which the following will occur:

- Whiting Turner will transfer to the Trustee $545,000 to be held in the client trust account of Trustee's counsel.

- The Fund will execute and deliver to the Trustee an unqualified release of all claims and liens against Whiting Turner and the project owner, and a release of claims against M&T relating to the stoppage of the cashier's check. The Trustee will hold these releases in escrow.

- M&T will transfer to the Trustee, for the benefit of the debtor's estate, $545,000 to be held in the client trust account of Trustee's counsel.

Upon completion of the above conditions, the Trustee will: (1) release the $545,000 to the Fund in satisfaction of all obligations under the Whiting Turner invoices; and (2) deliver the releases to counsel for the respective parties. Additionally, the agreement provides as follows:

- On the effective date, the debtor's payment to M&T of $545,000 on March 8, 2017 and the debtor's delivery of the cashier's check to the Fund, also on March 8, 2017, are deemed avoided pursuant to §549.

- The Fund's proof of claim shall be deemed allowed in the amount of $121,065 as an unsecured claim, subject to priority under §507(b)(5).

- The Fund waives and releases all claims and rights to payment from the debtor and its estate, including without limitation any right to payment of any administrative expense (other than claims under the Fund's proof of claim as resolved by the settlement).

The settlement agreement also specifically states that:

> [n]othing herein shall constitute a finding or determination regarding liens or security interests of any person (including without limitation Firstrust, Industrial Bank or the United States of America) in or to the payments avoided and recovered by the Trustee from M&T Bank pursuant to this Order.

ECF 386 at ¶27.

The Trustee filed the motion to approve the settlement on May 11, 2017. ECF 386. After the Banks filed their limited objections, the court held a hearing on the motion on June 15, 2017. At the hearing, parties referred to a number of decisions, including Fourth Circuit decisions, which had not been addressed in their pre-hearing filings. The court required the parties to file post-hearing briefs addressing the issue of whether a transfer occurred. The briefing is complete, ECF 463, 464, 465, 471, 472, 473, 474, and the matter is ripe for resolution.

Conclusions of Law

Pursuant to Federal Rule of Bankruptcy Procedure 9019(a), "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). A court may approve a settlement if it is "fair and equitable." *Protective Comm. for Indep. Stock Holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, *rhg. denied* 391 U.S. 909 (1968). In order to approve a settlement, a court must consider the following factors:

5

> (1) the probability of success in litigation;
> (2) the likely difficulties in collection;
> (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
> (4) the paramount interest of the creditors.

*Will v. Nw. Univ. (In re Nutraquest, Inc.),* 434 F.3d 639, 644 (3d Cir. 2006) (citation omitted); *see also In re Bowman,* 181 B.R. 836, 843 (Bankr. D. Md. 1995).

Here, the Banks do not generally dispute that the foregoing standards are met and do not oppose the funds being returned to the debtor and the parties exchanging releases. It is also clear that the settlement is in the best interest of the estate and meets the requirements for approval as a general matter.

The dispute between the parties is over the requirement in the settlement that "the debtor's payment to M&T of $545,000 on March 8, 2017 and the debtor's delivery of the cashier's check to the Fund, also on March 8, 2017, *are hereby deemed avoided pursuant to Section 549 of the Bankruptcy Code.*" ECF 386 at ¶23 (emphasis added). The Banks contend that, notwithstanding the apparent reservation in Paragraph 7 of their rights to assert a lien on the funds, this provision may prejudice their lien claim. They argue that no transfer occurred during the transaction and therefore the settlement cannot provide that a transfer is avoided under §549. In response, the Trustee contends that he is free to structure the settlement in a way that provides maximum benefit to the estate, even if the structure of the settlement prejudices the Banks' lien rights. He further argues that it is entirely appropriate to structure the settlement as an avoidance under §549 because a transfer occurred that is being avoided in the settlement.

Section 549 entitles a trustee to avoid unauthorized post-petition transfers of property belonging to the bankruptcy estate. §549. To avoid a transfer under §549, the Trustee must satisfy four elements: "(1) a transfer, (2) of property of the estate, (3) made after commencement

6

of the bankruptcy case, and (4) that is not authorized under the Bankruptcy Code or by the bankruptcy court." *Devan v. Phx. Am. Life Ins. Co. (In re Merry-Go-Round Enters.)*, 400 F.3d 219, 224 (4th Cir. 2005). No party disputes that elements (2) through (4) are met. Tthe dispute is with the first element: whether a transfer occurred.

The Bankruptcy Code defines "transfer" broadly to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." §101(54); *see also Ivey v. First Citizens Bank & Tr. Co. (In re Whitley)*, 848 F.3d 205, 208 (4th Cir. 2017) ("Congress sought to make '[t]he definition of transfer' in the Bankruptcy Code 'as broad as possible.'") (quoting S. Rep. No. 95–989, at 27 (1978)); *In re FBN Food Servs., Inc.*, 185 B.R. 265, 272 (N.D. Ill. 1995) (stating that Congress intended courts to construe the term "transfer" under §101(54) broadly, and finding that a transfer can include the release of the debtor's rights against another); *In re Wallaert*, 149 B.R. 665, 668 (Bankr. W.D. Wash. 1992) (finding that the "all-encompassing language unambiguously comprehends *any* disposition of *any* interest in property") (emphasis in original). "What constitutes a transfer and when it is complete is a matter of federal law." *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) (quotations omitted). But in the absence of controlling federal law, "property" and "interests in property" are controlled by state law. *Id.*

The Trustee contends that a transfer occurred several times during the transaction: first, when M&T issued the cashier's check from the debtor's funds; second, when the debtor delivered the cashier's check to the Fund; and third, when M&T stopped payment on the cashier's check and retained the funds. Because at least one transfer occurred, he argues, it is within his discretion to structure the settlement as an avoidance of the transfer under §549.

The court will address each in turn.

7

*The alleged transfers to M&T.*

No transfer occurred for bankruptcy purposes when the debtor obtained the cashier's check from M&T. In *Bowers v. Atlanta Motor Speedway (Bowers I)*, 99 F.3d 151 (4th Cir. 1996), the Fourth Circuit considered whether an entity is an initial transferee under §550(a)(1) or an immediate or mediate transferee under §550(a)(2). The distinction is significant in determining liability for an avoidable transfer under the Bankruptcy Code: §550(b) protects a mediate or immediate transferee who has taken for value in good faith without knowledge of the voidability of the transfer. However, the initial transferee does not receive this protection. "[T]he trustee's power to recover from [the initial transferee] under § 550(a)(1) is absolute." *Id*. The Fourth Circuit's analysis is pertinent here because if M&T is not an initial transferee, there can be no avoidable transfer to it under the Bankruptcy Code.

The Fourth Circuit determined that to be an initial transferee, one must "exercise legal dominion and control over the property." *Id.* at 156. The test requires more than "physical dominion and control." *Id*. "[T]he minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Id.* at 154 (quoting *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)).

The Fourth Circuit applied the "legal dominion and control" test adopted in *Bowers I* to a bank's issuance of a cashier's check in *Bowers v. Kuse Enters. (Bowers II)*, Case No. 97-2507, Adv. No. 97-2583, 1998 WL 957455 at *1 (4th Cir. Sep. 22, 1998). There, the trustee brought an action under §549 to recover two unauthorized, post-petition cashier's checks used to acquire a helicopter. *Id.* The defendant argued that the bank issuing the cashier's checks was the initial transferee. Therefore, defendant argued, because it gave value and lacked knowledge of the voidability of the transfer, it could not be liable for recovery of the cashier's checks as the

subsequent transferee under §550(b)(1). *Id.* at *3. As such, the Fourth Circuit had to examine a issuing bank's role under §550 when its customer obtains a cashier's check for payment to a third party. *Id.*

Relying on the rationale of *Bowers I*, the Fourth Circuit rejected the defendant's argument and held that the bank was not the initial transferee, but a mere conduit in the transaction:

> [T]o be an initial transferee, a party must exercise legal dominion and control over the property-physical possession of the property is not sufficient. Thus, a party acting as a "mere conduit" for the transfer of the property and who has no legal right to use the funds for its own purposes is not the "initial transferee" for purposes of § 550(a).

*Id.* at *3 (citing *Bowers I*, 99 F.3d at 155). The Fourth Circuit went on to explain that

> [a]lthough the funds were put in the Bank's possession, they were placed there solely to enable the Bank to issue the cashier's check to [defendant]. The Bank had no right to use the funds for other purposes and therefore lacked the authority to exercise legal dominion and control over the funds. Accordingly, under the dominion and control test adopted by this court in *Bowers I*, the Bank was not the "initial transferee" of the funds[.]

*Bowers II,* 1998 WL 957455 at *4 (emphasis added).

Under *Bowers I* and *Bowers II*, no transfer occurred to M&T when the debtor acquired the cashier's check. Where the issuing bank serves as no more than a "mere conduit" to the transaction, there is no transfer under bankruptcy law between the customer and the issuing bank because the issuing bank lacks legal dominion and control over the funds used to acquire the check.

Whether a transfer occurred once M&T stopped payment and retained the funds is not as clear. At that point, M&T ceased being a mere conduit. On the other hand, no one suggests M&T can simply retain the funds and not return them to the debtor or pay them to the Fund.

9

In determining the rights of the parties to the funds, in the absence of controlling federal law, the court looks to state law. A cashier's check is a draft on which the same bank acts as the drawer and drawee. Md. Code Ann., Com. Law. §3-104(g); *see also Rezapolvi v. First Nat. Bank of Md.*, 459 A.2d 183, 187 (Md. 1983); *Swiss Credit Bank v. Virginia National Bank*, 538 F.2d 587, 588 (4th Cir. 1976). "[A] cashier's check, purchased for adequate consideration, unlike an ordinary check, stands on its own foundation as an independent, unconditional and primary obligation of the Bank." *Rezapolvi*, 459 A.2d at 187 (internal quotation mark and citation omitted).

A "cashier's check is accepted by the act of issuance and becomes an irrevocable obligation of the issuing bank." *Citibank Fed. Sav. Bank v. New Plan Realty Tr. (New Plan Realty)*, 748 A.2d 24, 58 (Md. Ct. Spec. App. 2000). The issuing bank is generally obligated to pay it according to its terms at the time it was issued. Md. Code Ann., Com. Law §3-412. If the issuing bank wrongfully refuses to pay a cashier's check, the holder is entitled to compensation for expenses and loss of interest, and potentially for consequential damages. *Id.* at §3-411. The party who acquires the cashier's check cannot stop payment on it. *See Transcon. Holding Ltd. v. First Banks, Inc.*, 299 S.W.3d 629, 650 (Mo. Ct. App. 2009) ("Section 4-303 [of the U.C.C.] prevents the purchaser of a cashier's check from stopping payment on a cashier's check because it is not the purchaser's check."). The issuing bank, however, can stop payment as an accommodation to its customer, but the potential liability imposed by §3-411 "is designed to discourage this practice." Md. Code Ann., Com. Law §3-411, Uniform Commercial Code Comment 1; *see also Rezapolvi,* 459 A.2d at 187-88.

As one court explained:

> A cashier's check is the obligation of the bank rather than of the depositor as is the case in an ordinary check . . . . A cashier's check is paid from the issuing

10

> bank's own resources, rather than from a specific deposit balance, as is the case with ordinary checks. When a bank issues a cashier's check, it promises the purchaser that the check will be paid from the bank's resources, not from the purchaser's account upon presentation. Because the bank serves as both the drawer and the drawee of the cashier's check, the check becomes a promise by the bank to draw the amount of check from its own resources and to pay the check upon demand.

*Transcon. Holding*, 299 S.W.3d at 645-46; *see also Flatiron Linen, Inc. v. First Am. State Bank.*, 23 P.3d 1209, 1212 (Colo. 2001). For these reasons "a cashier's check circulates in the commercial world as the equivalent of cash . . . . People accept a cashier's check as a substitute for cash because the bank stands behind it, rather than an individual." *New Plan Realty*, 748 A.2d at 59 (quoting *Rezapolvi,* 459 A.2d at 187).

Accordingly, there can be no dispute that under state law, a transfer occurs when a customer acquires a cashier's check through a debit to its account or payment by check. The issuing bank reduces its liability to its customer, and assumes its own "independent, unconditional and primary" liability to the payee. But controlling federal law overrides the state law transfer for bankruptcy purposes under *Bowers I and II*. There are important policy considerations in play that lead courts to conclude that this is not a transfer for bankruptcy purposes. These considerations were stated by the court in *Bonded*, upon which the Fourth Circuit relied in *Bowers I*. In *Bonded*, the court addressed the transaction in the context of a fraudulent transfer, but the point is equally apt in the context of an unauthorized transfer under §549:

> The potential costs of monitoring and residual risk are evident when the transferees include banks and other financial intermediaries. The check-clearing system processes more than 100 million instruments every day; most pass through several banks as part of the collection process; each bank may be an owner of the instrument or agent for purposes of collecting at a given moment. Some of these instruments represent [unauthorized funds] conveyed out of bankrupts, yet the cost of checking back on the earlier transferors would be staggering. Bonded's trustee dismisses financial intermediaries on the ground that they obviously are

> not initial transferees, but this is not so clear. Hundreds of thousands of wire transfers occur every day. The sender of money on a wire transfer tells its bank to send instructions to the Federal Reserve System (for a Fedwire transfer) or to a correspondent bank to make money or credit available through still another bank. The Fed or the receiving bank could be called the "initial transferee" of the funds if we disregarded the function of [unauthorized transfer] law. Similarly, an armored car company might be called the "initial transferee" if the bankrupt gave it valuables or specie to carry. Exposing financial intermediaries and couriers to the risk of disgorging [an unauthorized transfer] in such circumstances would lead them to take precautions, the costs of which would fall on solvent customers without significantly increasing the protection of creditors.
>
> ********
>
> To treat "transferee" as "anyone who touches the money" and then to escape the absurd results that follow is to introduce useless steps; we slice these off with Occam's Razor and leave a more functional rule.

*Bonded*, 838 F.2d at 893, 894.

These policy considerations cease once the issuing bank stops payment on the cashier's check as an accommodation to its customer based on the customer's defenses. Notwithstanding the dishonor, the issuing bank's "independent, unconditional and primary obligation" to the payee, *Rezapolvi*, 459 A.2d at 187, is left unresolved and the payee has a potential claim against the issuer under §3-411. Further, because it has made an independent determination to stop payment of its obligation based on the customer's defenses, the issuing bank ceases being a mere conduit or financial intermediary. The concerns expressed in *Bonded* over the imposition of undue monitoring costs and imposing liability on banks that merely touch the money disappear: The issuing bank has placed itself in the center of a dispute between its customer and the payee over its liability. It has already reviewed the transaction and made a determination of what action to take. No extraneous monitoring costs are being imposed.

In this case, there is no need for the court to determine whether M&T can be liable to the Fund for wrongful dishonor. The proposed settlement resolves that issue: The Fund releases M&T from any liability for wrongful dishonor and the funds are paid to the debtor. As pertinent

here, once M&T stopped payment on the check as an accommodation to the debtor, it ceased being a "mere conduit" and placed itself in the middle of a potential dispute between the debtor and the Fund, leaving unresolved its own liability to the Fund on the cashier's check. M&T has legal dominion and control of the funds because its own liability must be resolved as part of any disposition of the funds. Accordingly, the court concludes that an avoidable transfer occurred once M&T stopped payment on the cashier's check and retained the funds.[2]

*The alleged transfer to the Fund.*

The court turns to whether a transfer occurred when the cashier's check was delivered to the Fund. In *Barnhill*, the Supreme Court established that, for purposes of §547(b), a transfer of an ordinary check does not occur until the check is honored by the drawee bank. *Barnhill*, 503 U.S. at 399. Its rationale was that until the check is honored, "receipt of a check gives the recipient no right in the funds held by the bank on the drawer's account. A myriad of events can intervene between delivery and presentment of the check that would result in the check being dishonored." *Id.* Courts have applied the *Barnhill* rationale to the analysis of §549 post-petition transfers, at least in cases of ordinary checks. *See In re Rainbow Music, Inc.*, 154 B.R. 559, 561 (Bankr. N.D. Cal. 1993). If the holding of *Barnhill* applies here, no transfer occurred when the cashier's check was delivered to the Fund.

---

[2] It is not determinative that no change in possession occurred at the time M&T stopped payment on the cashier's check. "The hallmark of a transfer is a change in the rights of the transferor with respect to the property after the transaction." *Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP)*, 408 B.R. 318, 338 (Bankr. N.D. Cal. 2010). For example, the grant of a lien constitutes a transfer even though possession of the collateral often does not change at the time of the grant. §101(54)(A); *Ward v. Bank of Granite (In re Hickory Printing Grp., Inc.)*, 479 B.R. 388, 389 (Bankr. W.D.N.C. 2012). Another example is where a debtor conveys real property to himself and his spouse, as tenants by the entirety, to place it beyond the reach of individual creditors. *Ford v. Poston*, 773 F.2d 52 (4th Cir. 1985). By stopping payment of the check and retaining the funds, M&T altered the rights of the debtor (and the Fund) with respect to the funds.

A number of courts, however, have reached a different conclusion in cases involving cashier's checks. The seminal case is *In re Lee*, 179 B.R. 149 (9th Cir. B.A.P. 1995), *aff'd,* 108 F.3d 239 (9th Cir. 1997). In *Lee,* the Ninth Circuit Bankruptcy Appellate Panel (the "BAP") determined that a cashier's check is transferred upon delivery, because the obligation to pay a cashier's check becomes fixed at that point. *In re Lee,* 179 B.R. at 161. The BAP explained that

> [a]lthough a purchaser cannot stop payment of the cashier's check, he or she could return the cashier's check or seek to have it cancelled as long as it is in his or her possession. Therefore, until delivery, the purchaser's property rights in the cashier's check are not transferred to the payee/holder.

*Id.* at 161–62 (citation omitted).

The BAP amplified the *Lee* holding in *Vasquez v. Mora (In re Mora)*, 218 B.R. 71 (9th Cir. B.A.P. 1998). In considering whether the transfer of a cashier's check occurs when it is deposited in the mail or actually received by the payee, the BAP held that "a cashier's check is transferred for purposes of § 549(a) when it is in the physical possession or control of the intended payee." *In re Mora*, 218 B.R. at 74.

Other cases have followed the rationale of *Lee* and *Mora*. *Hopkins v. Lojek (In re Scheu)*, 356 B.R. 751, 755 (Bankr. D. Idaho 2006) ("Under the controlling case law, it is the point in time when [the] cashier's check was delivered to Defendant that is crucial to the analysis in this action."); *Abele v. Mod. Fin. Plans Servs. (In re Cohen)*, 300 F.3d 1097, 1107 (9th Cir. 2002) (holding that a transfer occurred when cashier's check was delivered to the payee).

In *Lee, Mora,* and these other cases, there was no dispute that a transfer to the payee ultimately occurred. In each case, the cashier's check was honored and the payee received the funds. The dispute in these cases was when, not if, a transfer occurred to the payee.

The dispute in this case, however, is whether a transfer to the Fund occurred at all. It is true that, under the UCC, the cashier's check was accepted upon issuance. *New Plan Realty*, 748

14

A.2d at 31. But the debtor then convinced M&T to stop payment based on the debtor's defenses, not the bank's. One of the "myriad events" foretold by *Barnhill* which could prevent the payee from realizing the value of the check occurred here. *Barnhill*, 503 U.S. at 399. Thus, it would appear that where the issuing bank stops payment on the cashier's check after delivery as an accommodation to the customer, the soundness of *Lee* and *Mora* is questionable.

*Barnhill* is instructive on this point. There, the Supreme Court addressed the argument that the delivery of an ordinary check was a "conditional" transfer between the debtor and the payee and, because §101(54) recognizes "conditional" transfers, a transfer occurred. The Court acknowledged that there was "some force" to the argument that the payee received something when it received the check because the payee obtained, perhaps, a chose in action against the debtor. *Barnhill*, 503 U.S. at 400. The Court rejected the argument, however, noting that the payee did not obtain any rights against the debtor's account or the drawee bank:

> [U]ntil the moment of honor the debtor retains full control over disposition of the account and the account remains subject to a variety of actions by third parties. To treat petitioner's nebulous right to bring suit as a "conditional transfer" of the property would accomplish a near-limitless expansion of the term "conditional." *In the absence of any right against the bank* or the account, we think the fairer description is that petitioner had received no interest in debtor's property, not that his interest was "conditional."

*Id.* at 400–01 (emphasis added); *see also id*. at n.7 (recognizing that the recipient does not have a claim against the bank upon stop payment of an ordinary check). Under this rationale, the acceptance by the issuing bank upon the act of issuance, coupled with the Fund's "right against the bank" following delivery are sufficient to constitute a conditional transfer under §101(54).

The conclusion that delivery of the cashier's check constitutes a conditional transfer to the payee may be pertinent in determining when a transfer occurred in cases where the check is ultimately honored. The conditional transfer, however, cannot provide the basis for avoidance

15

under §549 in this case. The cashier's check was never honored. Although upon delivery the Fund may have acquired a claim against M&T, no "cash-equivalent" payment occurred. *In re Lee*, 108 F.3d at 242. No one could suggest that the Fund is liable for $545,000 under §549 and §550 for receipt of a check that was never honored. The court concludes that no avoidable transfer under §549 occurred to the Fund because the check was never honored.

## Conclusion

To approve the settlement, the court need only find that at least one avoidable transfer occurred. For the foregoing reasons, the court concludes that an avoidable transfer occurred when M&T stopped payment on the cashier's check and retained the funds. Accordingly, the provision in the proposed settlement that the transfer is avoided under §549 is appropriate. Although the court reaches a different conclusion on the purported transfer to the Fund, the court will overrule the Banks' objections to the Trustee's motion and approve the settlement. A separate order will issue.

cc:     All Parties
        All Counsel

**End of Memorandum of Decision**